IN THE MATTER OF WATER SUPPLY CRITICAL AREA NO. 2.

EVESHAM MUNICIPAL UTILITIES AUTHORITY AND WILLING-BORO MUNICIPAL UTILITIES AUTHORITY, APPELLANTS, v. THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 30, 1988—Decided April 18, 1989.

Before Judges KING, BRODY and ASHBEY.

*Edward A. Kondracki* argued the cause for appellant Evesham Municipal Utilities Authority (*Davis, Reberkenny & Abramowitz,* attorneys).

*Ronald E. Bookbinder* argued the cause for appellant-intervenor Mount Laurel Township Municipal Utilities Authority (*Bookbinder, Guest & Domzalski,* attorneys, *Nancy T. Abbott,* on the letter brief).

*John T. Barbour* argued the cause for appellant Willingboro Municipal Utilities Authority (*Barbour & Costa,* attorneys).

*Paul A. Schneider,* Deputy Attorney General, argued the cause for respondent the Department of Environmental Protection (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney, *Michael R. Clancy,* Deputy Attorney General, of counsel, *Dorothy M. Highland,* Deputy Attorney General, on the brief).

*John E. Harrington* argued the cause for respondent-intervenor Town of Maple Shade (*Dyer, Hendren & Harrington,* attorneys).

*Robert M. Washburn* argued the cause for amicus curiae, Builders League of South Jersey (*Sherman, Silverstein & Kohl,* attorneys).

The opinion of the court was delivered by

KING, P.J.A.D.

This appeal is taken from an administrative order of October 24, 1986 issued by the Department of Environmental Protection (DEP). The order declared "the establishment of Water Supply Critical Area No. 2" and ordered "that the Procedures for Implementation of Water Supply Critical Area No. 2 ... be followed by all affected purveyors and users of water within the critical area, effective this date." The implicated area encompassed most of Camden, Burlington and Gloucester Counties and smaller portions of five counties adjoining them.

DEP issued the order pursuant to the Water Supply Management Act of 1981 (Act), *N.J.S.A.* 58:1A–1 to –17, *L.*1981, *c.* 262, and the rules enacted under it, *N.J.A.C.* 7:19–6.1 to –6.14 (reductions of use under "adverse conditions" requiring "special measures"), especially *N.J.A.C.* 7:9–6.10(a), (c) and (d). DEP asserts that excessive water use, salt-water intrusion and industrial waste discharges seriously threaten the Potomac–Raritan–Magathy (PRM) Acquifer System which underlies Critical Area No. 2. The order established two zones within the Critical Area. They were divided by the potentiometric contour line where the PRM Acquifer is 30 feet below main sea level. Within the inner area, the depleted area, water purveyors would have to reduce pumping from the PRM Acquifer by 35% of the 1983 water usage. Within the outer area, the so-called marginal area, purveyors were restricted to the amount of water drawn in 1983 from the acquifer. DEP ostensibly would disapprove any additional water withdrawals, with exceptions where the user had adopted plans for an alternate supply but the water would not be available in time to meet the need or the user would commit to purchasing water when alternate supplies became available.

DEP subsequently issued the finalized "Procedures for Implementation of Water Supply Critical Area No. 2" on October 31, 1986. DEP also issued a document summarizing the March and July 1986 public hearings. In December 1986 DEP sent a corrected version of the procedures to all affected users. As in the original procedures, the corrected version provided that the

mandatory reduction in ground water withdrawals will not be effective until an alternative source becomes operational unless the conditions of these procedures and/or of the permit are not met. However, fourteen months after written notification of a user's base allocation, each user, either connected or unconnected, will be required to develop an Alternative Water Supply Plan which must make firm and formal commitments for alternative water. As soon as proposals for water conservation plans and possible alternative sources are reviewed and verified, the user must sign a contract with a water utility or else contract for construction of the alternative source. Approval of the contracts by the Department may be required.

Evesham Municipal Utility Authority (EMUA) appealed on December 1, 1986. In March 1987 Mt. Laurel Township Municipal Utilities Authority (MLTMUA) filed a motion for leave to intervene which was granted. On October 13, 1987 we heard oral argument on DEP's cross-motion to dismiss the appeal and EMUA's motion for summary disposition. *R.* 2:8–3(b). On October 13, 1987 we denied EMUA's motion for summary disposition, denied DEP's cross-motion to dismiss the appeal, granted Maple Shade Township's motion to intervene, and consolidated EMUA's appeal (A–1560–86T1) with the companion appeal by Willingboro Municipal Utilities Authority (WMUA) (A–1790–86T1) filed on December 8, 1986. On February 3, 1988 we granted the motion by the Builders' League of South Jersey to appear *amicus.*

The appellants and the *amicus* stress that the water demands generated by population growth in the region conflict with DEP's proposed severe cutback in the water usage and that the order lacks legal authority. DEP maintains that the cutbacks are necessary and within its statutory authority.

Our general power to review agency action is carefully circumscribed. Administrative agencies are properly categorized as part of the government's executive branch because they "exercise executive power in administering legislative authority selectively delegated to them by statute." *City of Hackensack v. Winner,* 82 *N.J.* 1, 28 (1980). The administrative process involves aspects of all three branches of government. *Gloucester Cty. Welfare Bd. v. N.J. Civ. Serv. Comm'n,* 93 *N.J.* 384, 389 (1983).

The process has been described as a "concentration of powers" comprised of "an admixture of law-making, law enforcement and law-interpretation." J. Jacobs, "Administrative Agencies, their Status and Powers," in *II State of New Jersey Constitutional Convention of 1947* 1431, 1436 (S. Goldmann & H. Crystal eds. 1951). Similarly, Dean Landis characterized administrative power as the "full ambit of authority necessary for [the administrative agency] ... to plan, to promote, and to police, [and] it presents an assemblage of rights normally exercisable by government as a whole." *The Administrative Process* 15 (1938). In the performance of its delegated responsibility an agency formulates policy and investigates and adjudicates controversies. In discharging its

specialized tasks the agency must gather and analyze relevant data and material. As a result, the administrative agency acquires expertise in technical matters and a comprehensive knowledge of its particular field. L. Jaffe, *Judicial Control of Administrative Action* 25–26 (1965). It is not surprising, therefore, that the "vast majority of public administrative theorists have argued persuasively that although general political controls should guide administrative decision making, daily and routine administrative work is best handled by objective and professional administrators." K. Warren, *Administrative Law in the American Political System* 200 (1982). [*Gloucester Cty. Welfare Bd.*, 93 *N.J.* at 389–390.]

Courts are "constitutionally-founded, independent and impartial adjudicative tribunals constituted to hold and exercise the judicial power which emanates directly from the Constitution." *Gloucester Cty. Welfare Bd.*, 93 *N.J.* at 390. In recognition of the administrative agencies' executive function, courts "are aware that the judicial capacity to review administrative actions is limited." *Pub. Serv. Elec. v. N.J. Dept. of Environ.*, 101 *N.J.* 95, 103 (1985). Our Supreme Court has stated the judicial role in administrative review:

Though sometimes subsumed in the search for arbitrary or unreasonable agency action, the judicial role is restricted to three inquiries: (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings upon which the agency based application of legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors. *Campbell v. Department of Civil Serv.*, 39 *N.J.* 556, 562 (1963); *see also Henry v. Rahway State Prison*, 81 *N.J.* 571, 579–580 (1980) (court will reverse decision of administrative agency only if it is arbitrary, capricious, or unreasonable or if it is not supported by substantial credible evidence in the record as a whole). [*Pub. Serv. Elec.*, 101 *N.J.* at 103.]

We conclude that the Water Supply Management Act of 1981 does not give DEP the authority to order the holder of a diversity permit to reduce the quantity of water currently diverted without the Governor declaring a state of water emergency. Thus DEP's order of August 24, 1986 requiring reductions of present diversions to either 1983 levels or to 35% less in the marginal and depleted areas, respectively, was beyond the scope of the agency's authority and invalid. The Act does empower DEP's Commissioner to order, "during the duration of a state of water emergency" any user or distributor "to reduce

by a specified amount the use or distribution of any water supply." *N.J.S.A.* 58:1A–4(c)(1) and (2). We conclude that DEP's Commissioner may exercise this power only after the Governor acts by executive order and declares a state of water emergency. *N.J.S.A.* 58:1A–4(a) ("Upon a finding by the Commissioner that there exists or impends a water supply shortage of a dimension which endangers the public health, safety, or welfare in all or any part of the State, the Governor is authorized to proclaim by executive order a state of water emergency.") The Governor may limit the state of emergency to specific categories of water supplies or to specific areas. *Ibid.* The Act does not impose a time limit on the state of emergency. *N.J.S.A.* 58:1A–4(h) (emergency remains effective until terminated by executive order).

In the case before us, DEP did not ask for a declaration of a state of emergency by the Governor and none was declared. Instead, DEP issued the order pursuant to *N.J.A.C* 7:19–6.10(c) and (d) of the Water Supply Management Act Rules which provide:

> (a) Water supply critical areas are those areas in which it is officially determined by the Department, after public notice and a public meeting, that adverse conditions exist, related to the ground or surface water, which require special measures in order to achieve the objectives of the Act ...
>
> . . . .
>
> (c) Within water supply critical areas ... the Department may reduce the privilege given to users to withdraw water, as previously allocated or authorized, and require those users to substitute water from a reasonably available alternative source....
>
> (d) Within critical water supply areas ... the Department may require ...:
>
> . . . .
>
> 2. Reduction in the amounts of water withdrawn by users.

Because DEP issued this regulation without statutory authority, the regulation is invalid.

Our Legislature adopted the Water Supply Management Act to create a regulatory system for the State's water resources effectively and productively ensuring the present and future adequate supply and quality of water and to protect the natural environment of the State's waterways. *N.J.S.A.* 58:1A–2. This

regulatory power was placed with DEP. *Id.* This power was described this way:

> [I]t is necessary that the State, through its Department of Environmental Protection, have the power to manage the water supply by adopting a uniform water diversion permit system and fee schedule, a monitoring, inspection and enforcement program, a program to study and manage the State's water resources and plan for emergencies and future water needs, and regulations to manage the waters of the State during water supply and water quality emergencies. [*N.J.S.A.* 58:1A-2.]

Concerning the continuation of existing water diversion permits, our Legislature required DEP, in developing the permit system, to permit

> privileges previously allowed pursuant to lawful legislative or administrative action, except that the department may, after notice and hearing, limit the exercises of the privileges to the extent currently exercised, subject to contract, or reasonably required for a demonstrated future need. [*N.J.S.A.* 58:1A-6(a)(1).]

Upon the expiration of diversion permits, DEP was directed to renew the permits

> for the same quantity of water, except that the department may, after notice and hearing, limit that quantity to the amount currently diverted, subject to contract, or reasonably required for a demonstrated future need. [*N.J.S.A.* 58:1A-7(b).]

While these statutory sections allow DEP to limit water diversion privileges, the limitations permitted are narrowly described. DEP may only limit the quantity of water diverted to the extent currently exercised or diverted, whether or not the privilege given by the permit was fully utilized, and to the extent reasonably required for a demonstrated future need of the permit holder and its customers. DEP may not order a reduction in a diversion privilege less than that which was being exercised or diverted at the time of the order, absent an emergency proclamation. *N.J.S.A* 58:1A-6 and 1A-7 do not expressly prohibit a reduction in currently permitted diversion. But the prohibition clearly is implicit in the narrow exceptions to the statute's mandate that DEP renew a diversion permit for privileges previously allowed or, upon notice and a hearing, limit the grant to current diversion or reasonable future need.

DEP's express power to order a usage reduction arises only under *N.J.S.A.* 58:1A-4 in the subsections following the grant

of the exercise of the power of the Governor to proclaim a state of water emergency, once DEP's Commissioner has determined that a water supply shortage "exists or impends." *N.J.S.A.* 58:1A–4(a). Concerning "State of Water Emergency; emergency water supply allocation plan; powers of Governor and commissioner; order; review[,]" *N.J.S.A.* 58:1A–4 in relevant part provides:

a. Upon a finding by the commissioner that there exists or impends a water supply shortage of a dimension which endangers the public health, safety, or welfare in all or any part of the State, the Governor is authorized to proclaim by executive order a state of water emergency. The Governor may limit the applicability of any state of emergency to specific categories of water supplies or to specific areas of the State in which a shortage exists or impends.

b. The department shall, within 180 days of the effective date of this act, adopt an Emergency Water Supply Allocation Plan as a rule and regulation. This plan shall be utilized as the basis for imposing water usage *restrictions* during a declared state of water emergency and shall include a priority system for the order in which *restrictions* would be imposed upon the various categories of water usage.

c. *During the duration of a state of water emergency the commissioner,* to the extent not in conflict with applicable Federal law or regulation but notwithstanding any State or local law or contractual agreement, *shall be empowered to:*

(1) Order any person to *reduce* by a specified amount *the usage of any water supply;* to make use of an alternate water supply where possible; to make emergency interconnections between systems; to transfer water from any public or private system; or to cease the use of any water supply;

(2) Order any person engaged in the distribution of any water supply *to reduce* or increase by a specified amount or to cease *the distribution of that water supply;* to distribute a specified amount of water to certain users as specified by the commissioner; or to share any water supply with other distributors thereof;

(3) Establish priorities for the distribution of any water supply;

(4) Adopt rules and regulations as are necessary and proper to carry out the purpose of this section....

Neither *N.J.S.A.* 58:1A–6 (continuation of existing permits) nor *N.J.S.A.* 58:1A–7 (new permits) permits reductions by DEP's Commissioner absent an emergency proclamation. Under these sections, in establishing and enforcing the permit system, DEP's Commissioner may only limit water use and diversion to the "extent currently exercised, subject to contract, or ... reasonably required for a demonstrated future need." *Ibid.*

The Act does not provide DEP independent authority to reduce diversion below current usage without the Governor's proclamation of an emergency.

The Act's legislative history and the enactment process confirms our interpretation that the Act does not give DEP unfettered or discretionary power to reduce diversion privileges. Preenactment history and legislative action on proposed amendments is useful, sometimes valuable, as an interpretative aid. *State v. Crawley*, 90 *N.J.* 241, 245–246 (1982); *Skeer v. EMK Motors, Inc.*, 187 *N.J.Super.* 465, 473 (App.Div.1982); *see* 2A *Sutherland, Statutory Construction* (4th ed., Sands 1984) § 48.03 at 290 and § 48.18 at 341.

The original Senate Bill proposing the Act, S–1611, introduced on November 24, 1980 by Senator Dodd, granted DEP much broader powers over water use and diversion than those ultimately conferred by the Act, as adopted. Indeed, under the original proposal, DEP had virtually plenary powers.

In the initially proposed Senate Bill 1611, DEP had this mandate:

> The department in developing the permit system established by this act shall:
> (1) permit privileges previously allowed pursuant to lawful legislative or administrative action, except that the department may impose limits and conditions thereon as may be deemed reasonable to carry out the purposes of this act in a manner and to the extent consistent with applicable provisions of law. [§ 5(a)(1) of initial Senate Bill 1611.]

This language sharply contrasts with the language of the adopted Act. Under the proposed language DEP could generally "impose limits and conditions," *i.e.*, reduce a diversion privilege, so long as the reduction was deemed necessary to carry out the purposes of the Act and was otherwise legal. No other restrictions or conditions on ordering reductions were imposed by the proposed legislation. As noted, this is not the case in the Act as adopted, which specifically states the conditions under which reductions in diversion can be ordered. Had the Legislature intended that DEP possess a general discretionary power to reduce diversion privileges, the Legislature would have retained the original bill's broad language in the adopted

statute. The Legislature did not. Rather, the Legislature specifically restricted the reduction power to emergencies proclaimed by the Governor.

The fact that the Legislature intended to restrict DEP's reduction power is also supported by a comparison between the sponsor's statement to the original bill and the statement to the substitute bill which eventually became law. These respective statements aptly summarize the substance of the two bills. The Statement by the sponsor to the initial Senate Bill, repeated below in full, stressed the broad powers in DEP conferred by the proposed legislation:

### STATEMENT

Citizens of New Jersey face enormous problems in regard to the waters of the State. Existing potable water shortages in critical areas, compounded by ever-increasing discoveries of contamination of surface waters and ground waters, mandate the enactment of a comprehensive water supply management act. Lack of adequate emergency powers to alleviate periods of drought, additionally point out the need for revision of existing ineffective and archaic laws.

For these reasons, this bill authorizes the Department of Environmental Protection to establish a comprehensive water supply program which will ensure an adequate quantity and quality of water for the present and future citizens of the State. This program will include a uniform permit and fee system, procedures whereby holders or claimants of water diversion privileges are brought within the permit system, provisions to monitor the water supply of the State to gather information for planning for the future and enforcing the present program, *power to order diverters and water suppliers to take the actions necessary to provide an adequate quantity and quality of water, and the power to plan for emergencies and implement those plans when emergencies arise.* [Emphasis supplied; original Senate Bill 1611, November 24, 1980.]

While the Statement to the initial Senate Bill 1611 stressed the bill's proposal to empower DEP "to order diverters and water suppliers to take action to insure an adequate quantity and quality of water," the Statement to the bill as adopted emphasized the Governor's power in emergencies and the diverters' rights to retain privileges previously granted, points not mentioned in the original bill. The substitute bill thus represented a "watering down" or dilution of the original powers proposed for DEP.

This is the Statement to the Senate Energy and Environment Committee for Senate Bills No. 1611 and 1613, June 15, 1981 (No. 1613 related to rate-making) which became the Water Supply Act of 1981. We fully iterate the Statement because it describes the changes between the originally proposed bill and the different design of the substituted bill which became law:

### SENATE ENERGY AND ENVIRONMENT COMMITTEE STATEMENT TO
### SENATE COMMITTEE SUBSTITUTE FOR
### SENATE, NOS. 1611 AND 1613
### STATE OF NEW JERSEY
### DATED: JUNE 15, 1981

As originally introduced, Senate Bill No. 1611, the "Water Supply Management Act" provided for a revamp of the existing permitting and regulatory authority of the Department of Environmental Protection concerning the diversion of the ground and surface waters of this State. Senate Bill No. 1613, as originally introduced, subjected public water companies to the rate-making jurisdiction of the Board of Public Utilities.

The Senate Committee Substitute for both Senate Bill No. 1611 and Senate Bill No. 1613 was drafted subsequent to the four public hearings and several public meetings held concerning these measures. *As a result,* the concept and provisions of Senate Bill No. 1613 were entirely abandoned, and *substantial and significant revisions to the provisions of Senate Bill No. 1611 were adopted.*

The provisions of the Committee Substitute would: (1) replace the provisions of Senate Bill No. 1613 (subjecting public water companies to the rate-making jurisdiction of the Board of Public Utilities) with a requirement that the Division of Local Government Services in the Department of Community Affairs, when reviewing the annual budget of a public water company, certify that adequate funds are included to make any improvements which the Department of Environmental Protection determines, pursuant to existing statutory authority re-enacted by this bill, to be necessary to assure that the water company can provide adequate service to its customers. The committee believes that this approach will satisfy the purpose of Senate Bill No. 1613 (insuring adequate service by public water companies) without needlessly imposing the financial and procedural burdens of treating these companies as public utilities; (2) *provide for the declaration, by the Governor, of a water supply emergency in one or more of the areas of the State;* (3) *authorize the department to exercise certain specific powers during an emergency;* (4) *direct the department to adopt an Emergency Water Supply Allocation Plan to be implemented during an emergency;* (5) provide for due process and compensation with respect to the exercise of departmental powers; (6) establish 100,000 gallons per day, rather than 10,000, as the threshold for the requirement for a

diversion permit; (7) *afford holders of existing diversion privileges the opportunity to register those privileges and retain the right to divert the amount of water currently diverted, subject to contract, or reasonably required for a demonstrated future.* This procedure, in the opinion of the committee, will insure adequate notice and opportunity to be heard to these holders, and precludes the need for compensation for diversion privileges which were not, and could not, have been exercised by the holder thereof, thereby making this water available to the citizens of this State; (8) establish a 5-year water usage certification program for farmers, in lieu of diversion permits; (9) provides for the adoption and periodic revision of a New Jersey Statewide Water Supply Plan; and (10) establish a Water Supply Advisory Council to provide guidance on the Water Supply Plan, the diversion permit program, and the Emergency Water Supply Allocation Plan. [Emphasis supplied.]

The "substantial and significant revisions" to the original bill curtailed DEP's power to order reductions. For these reasons, we conclude that the DEP's order of October 24, 1986 compelling reduction in the described critical area to 1983 use, or 35% of 1983 use, was without legislative authority, absent an executive proclamation, and was invalid.

Because we find that the Commission, through the Division of Water Resources of the DEP, did not have the statutory power to order reductions in water diversion and usage, without an executive proclamation by order of the Governor pursuant to *N.J.S.A.* 58:1A–4(a) of the Act, we need not consider the remaining points raised on this appeal.

Reversed.